FILED

2013 Aug-20  PM 01:07
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA

ROBERT KEMPEN,

               Plaintiff,

vs.

COLONIAL PROPERTIES TRUST,
COLONIAL REALTY LIMITED
PARTNERSHIP, MID-AMERICA
APARTMENT COMMUNITIES, INC.,
MID-AMERICA APARTMENTS, L.P.,
MARTHA MERGER SUB, L.P.,
THOMAS H. LOWDER, CARL F.
BAILEY, JOHN W. SPIEGEL, EDWIN
W. CRAWFORD, M. MILLER GORRIE,
WILLIAM M. JOHNSON, JAMES K.
LOWDER, HERBERT A. MEISLER,
CLAUDE B. NIELSEN, and HAROLD W.
RIPPS,

               Defendants.

Case No.

**COMPLAINT**

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff Robert Kempen ("Plaintiff"), by his attorneys, alleges upon

information and belief, except for his own acts, which are alleged on knowledge,

as follows:

### NATURE OF THE CASE

1.    This action arises out of the proposed merger (the "Merger") of

Colonial Properties Trust ("Colonial" or the "Company") and Mid-America

Apartment Communities, Inc. ("MAA"), announced on June 3, 2013, pursuant to which MAA plans to acquire all of the outstanding shares of Colonial's common stock in an all-stock transaction whereby each Colonial shareholder will receive 0.36 shares of MAA common stock for each share of Colonial common stock. Based on MAA's closing stock price on June 2, 2013, the Merger is worth approximately $24.47 per share (or a total of $2.2 billion) to Colonial's shareholders. Plaintiff brings claims *individually* against Defendants for their violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 14a-9 promulgated thereunder ("Rule 14a-9").

2.      On July 19, 2013, MAA filed with the U.S. Securities and Exchange Commission ("SEC") a Form S-4 Registration Statement, which serves as Colonial's preliminary proxy statement (the "Proxy Statement").  The Proxy Statement, which contains a recommendation from the Board to vote "FOR" the Merger.  Notwithstanding that Board's fiduciary duty to disclose any and all material information concerning the Merger, the Proxy Statement fails to provide shareholders with material information concerning, among other things, Colonial's projections, the financial analyses performed by BofA Merrill Lynch that purportedly substantiate the alleged fairness of the proposed Merger, key facts regarding conflicts of interest affecting Defendants and BofA Merrill Lynch, and information concerning the process leading up to the Merger.

3.      Consequently, Plaintiff will be unable to make a fully informed decision whether to vote for (or against) the Merger and also whether to exercise his appraisal rights and seek "fair value" for his shares.

4.      As a result of such misconduct, Plaintiff stands to suffer irreparable harm.  Plaintiff, therefore, seeks to enjoin the Merger unless and until defendants cure their violations of the federal securities laws.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction), as this Complaint alleges violations of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

6.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because: (a) one or more of the Defendants either resides in or maintains executive offices here; (b) a substantial portion of the transactions and wrongs complained of herein occurred here; and (c) Defendants have received substantial compensation and other transfers of money here by doing business here and engaging in activities having an effect here.

## PARTIES

7.      Plaintiff is, and has been at all relevant times, the owner of shares of Colonial common stock.

8.     Defendant Lowder has been the Chairman of the Board since 1993 and was reappointed as Chief Executive Officer effective December 30, 2008. Lowder previously served as President and Chief Executive Officer from July 1993 until April 2006.  Lowder and Defendant James K. Lowder are brothers. Furthermore, Lowder and James K. Lowder each own half of The Colonial Company, which owns the Colonial Insurance Agency.  The Colonial Insurance Agency, in turn, has provided insurance risk management, administration, and brokerage services for the Trust.  Lowder has also served as a past member of the Community Foundation of Greater Birmingham and has been a board member for Birmingham Southern College.

9.     Defendant Carl F. Bailey has been a trustee of Colonial since 1993. Alongside Chairman and CEO Lowder, Bailey is a member of the board of trustees of Birmingham Southern College and former chairman of its board.

10.    Defendant John W. Spiegel has been a trustee of Colonial since 2003.

11.    Defendant Edwin M. "Mac" Crawford has been a trustee of Colonial since 2011.

12.    Defendant M. Miller Gorrie has been a trustee of Colonial since 1993. Gorrie served as the Chief Executive Officer of Brasfield & Gorrie, L.L.C., a commercial construction company, from 1964 until 2010 and has been chairman of its Board of Directors since 1964.  The Trust historically has used Brasfield &

Gorrie to manage and oversee certain of its development, redevelopment, and expansion projects. The Trust paid $8.0 million, $4.1 million, and $13.7 million for property construction and tenant improvement costs to Brasfield & Gorrie during the years ended December 31, 2012, 2011, and 2010, respectively. In addition, the Trust had $1.6 million, $2.4 million, and $1.9 million in outstanding construction invoices or retainage payable to this construction company at December 31, 2012, 2011, and 2010, respectively. Alongside Chairman and CEO Lowder, Gorrie has also served as a director of the Community Foundation of Greater Birmingham and AmSouth Bank Corporation.

13.     Defendant William M. Johnson has been a trustee of Colonial since 1997. Mr. Johnson founded and was previously chief executive officer of Johnson Development Company, an Atlanta-based real estate development, leasing, and management company. Colonial and Mr. Johnson's company have a longstanding commercial relationship, with Colonial having purchased numerous properties from Mr. Johnson. Johnson also currently owns 210,200 units of Colonial LP.

14.     Defendant James K. Lowder has been a trustee of Colonial since 1993. James K. Lowder and Lowder are brothers. Mr. James K. Lowder and his brother, Colonial's Chairman and CEO, each own half of the Colonial Company, which owns the Colonial Insurance Agency. The Colonial Insurance Agency, in

turn, has provided insurance risk management, administration, and brokerage services for the Trust.

15.     Defendant Herbert A. Meisler has been a trustee of Colonial since 1995.  Meisler formed The Rime Companies with Defendant Ripps.  The Rime Companies is a real estate development, construction, and management firm specializing in the development of multifamily properties.  Meisler has been the president of The Rime Companies since 1964.  Meisler and Ripps are brother-in-laws.

16.     Defendant Claude B. Nielsen has been a trustee of Colonial since 1993.  Nielsen previously served on the board of directors of AmSouth Bank Corporation.

17.     Defendant Harold W. Ripps has been a trustee of Colonial since 1995.  Ripps formed The Rime Companies with Meisler and has served as its chief executive officer since 1969.  Ripps is a member of the board of trustees of the President's Council of Birmingham Southern College.  Ripps and Meisler are brothers-in-law.

18.     Colonial is a real estate investment trust ("REIT") organized and existing under the laws of the State of Alabama.  It maintains its principal executive offices at 2101 Sixth Avenue North, Suite 750, Birmingham, Alabama.

19.     Defendant Colonial LP is a Delaware limited partnership and is a signatory to the Merger Agreement.  Colonial LP is the primary operating entity through which Colonial conducts its business.

20.     Defendant MAA is a Tennessee corporation with its headquarters located at 6584 Poplar Avenue, Memphis, Tennessee.  MAA is a self-managed REIT that acquires, owns, and operates apartment communities across 13 states in the Sunbelt region of the United States.

21.     Defendant MAA Operating Partnership is a Tennessee limited partnership that is a signatory to the Merger Agreement.

22.     Defendant Merger Sub is a Delaware limited partnership and indirect wholly-owned subsidiary of MAA Operating Partnership that was created for the purposes of effectuating the Merger.

## SUBSTANTIVE ALLEGATIONS

### *Colonial's Background and Poise for Growth*

23.     Colonial is a multifamily-focused self-administered equity real estate investment trust that owns, operates, and develops multifamily apartment communities primarily located in the Sunbelt region of the United States.

24.     Colonial is governed by its Board of Trustees and is run primarily by the members of its management.

25.    Colonial's only material asset is its ownership of limited partnership interests in Colonial LP, a Delaware limited partnership formed in 1993. Colonial LP and its subsidiaries conduct all of Colonial's business, hold all of Colonial's consolidated assets and generate all of Colonial's revenues. Colonial is the sole general partner of Colonial LP and, as of June 30, 2013, owned approximately 92.5% of the outstanding partnership interests of Colonial LP.

26.    The Trust is a fully-integrated real estate investment trust, meaning that it is engaged in the acquisition, development, ownership, management, and leasing of multifamily apartment communities and other commercial real estate properties. As of December 31, 2012, Colonial either fully or partially owns and operates 125 properties located in Alabama, Arizona, Florida, Georgia, Louisiana, Nevada, North Carolina, South Carolina, Tennessee, Texas, and Virginia.

27.    Colonial has enjoyed tremendous growth over the past year. For instance, the Trust reported its financial results for the period ended June 30, 2012, in a July 26, 2012 press release and announced that funds from operations ("FFO"), which is a widely accepted measure of real estate investment trust performance, was $29.9 million for the second quarter compared to $28.7 million for the same period of the previous year. Colonial attributed the FFO growth to an increase in multifamily same-property net operating income ("NOI") of 7.3% when

compared to the second quarter of 2011. The Board also declared a $0.18 dividend for the third quarter of 2012.

28.     In an October 25, 2012 press release, Colonial announced its financial results for the third quarter of 2012 for the period ended September 30, 2012. Colonial reported that FFO for the quarter was $29 million, or $0.31 per diluted share, compared with $26.4 million, or $0.28 per diluted share for the same period of 2011. The Trust again attributed its strong FFO results to an 8.3% increase in multifamily same-property NOI when compared to the third quarter of 2011. The Trust also reported that it declared a cash dividend of $0.18 for the fourth quarter of 2012.

29.     Defendant Lowder commented on the Trust's results, stating, "We were able to produce another strong quarter of strong family operating results and further execute on our business strategy."

30.     Colonial reported its fourth quarter and full year financial results for the period ended December 31, 2012 in a January 24, 2013 press release. The Trust's FFO for the year totaled $105.1 million or $1.11 per diluted share, compared with $104.7 million or $1.15 per diluted share for the same period of 2011. For the quarter, the Trust reported net income of $16.0 million or $0.18 per diluted share, compared to net income of $9.1 million or $0.10 per diluted share for

fourth quarter of 2011.  Fourth quarter of 2012 also saw an increase in multifamily same-property NOI of 6.7% compared to fourth quarter of 2011.

31.     In the same press release, Lowder was quoted as saying that the Trust's "core multifamily operating fundamentals continue to perform well[]" and that "[s]olid occupancy and leasing, combined with expense controls, led to our best year-over-year same-property NOI growth rate in our Company's history." The press release also noted that the Trust's Board voted to increase the quarterly cash dividend on common shares for the first quarter of 2013 to $0.21 per common share, representing a 16.7% increase compared to the Trust's third and fourth quarter dividends.

32.     In a presentation at the Citi 2013 Global Property CEO Conference on March 4, 2013, the Trust provided guidance for 2013 of FFO of $1.34 to $1.40 per share, a significant increase compared with the FFO of $1.11 per share for 2012.

33.     Colonial also provided guidance for 2013 of income per share of $0.29 to $0.45 per diluted share, almost doubling net income of $0.22 per diluted share for 2012.

34.     In an April 25, 2013 press release Colonial announced its financial results for the first quarter of 2013, for the period ended March 31, 2013. The Trust reported net income of $5.6 million or $0.06 per diluted share, compared with a net loss of $6.0 million or $0.07 per diluted share in first quarter of 2012.

35.     Colonial also reported FFO for the quarter of $31.8 million or $0.34 per diluted share compared with FFO of $28 million or $0.30 per diluted share for the same period of 2012.  The Trust noted that multifamily same-property NOI increased 6.8% when compared to the first quarter of 2012.  Additionally, for the second consecutive quarter the Board declared a $0.21 quarterly cash dividend on common shares for the second quarter of 2013.

36.     In discussing the Trust's financial results, Lowder stated:

> Simplified and stronger best describe the company and the progress we have made over the past few years. . . . Our multifamily development pipeline is creating significant value for our shareholders, while the disposition of our commercial assets continues to strengthen our balance sheet and simplify the company.

37.     Reflecting the positive results detailed above, the Trust's share price has been trending upwards for the past year. Indeed, the Trust's per share stock price rose approximately 44.5% from an adjusted closing price of $16.97 on September 30, 2011 to a high of $24.52 on May 21, 2013.

38.     Despite the Trust's recent strong performance and positioning for growth, the Board agreed to the proposed Merger, as outlined below.

### *Overview of the Proposed Merger*

39.     On June 3, 2013, Colonial announced in a press release that it had entered into the Merger Agreement with MAA, pursuant to which MAA, through

Merger Sub, plans to acquire each outstanding share of Colonial's common stock in an all-stock transaction worth approximately $2.2 billion.

40.     Under the terms of the parties' Merger Agreement, each outstanding share of Colonial common stock will be converted into the right to receive 0.36 shares of MAA common stock.

41.     Based on MAA's closing stock price on June 2, 2013, the Merger is worth approximately $24.47 per share to Colonial's shareholders.

42.     As part of the proposed Merger, each Colonial common share will be converted into 0.36 newly issued MAA common shares, with the combined company becoming a UPREIT.  In addition, holders of Colonial LP units will receive 0.36 units of the MAA limited partnership counterpart for each of their Colonial LP units.

43.     The proposed Merger, which is expected to close in September 2013, is contingent on, among other things, the affirmative vote of a majority of Colonial's outstanding shares.

44.     BofA Merrill Lynch served as the Board's financial advisor in connection with the process leading up to the execution of the Merger Agreement.

### *The Deficient Sales Process*

45.     In the spring of 2012, the Colonial Board decided to consider a strategic combination.  At that time, the Board decided to approach just two

parties: MAA and an unknown entity referred to in the Proxy Statement simply as
"Company A."

46.    No discussion of an auction was had at that time.

47.    Lowder approached Company A, which never responded. Lowder
also approached MAA, and discussions about a strategic combination ensued.

48.    Prior to its decision to consider a strategic combination, the Board had
received an unsolicited offer from Company C with an initial value of $22 to $25
per share in cash. The Board decided not to act on the offer because, among other
reasons, the Trustees purportedly believed that the price was inadequate, even
though they did not appear to have performed any financial analyses concerning
Company C's offer.

49.    Company C contacted Lowder in again July 2012 to discuss a
strategic acquisition of Colonial, but Lowder declined.

50.    Instead, Lowder and the Board focused on MAA.  By December 11,
2012, MAA made its initial offer of a stock-for-stock transaction at an exchange
ratio of 0.340.  The Board decided to counter at 0.370, which amounted to $23.40
per share. MAA countered with 0.349, to which Colonial came back with 0.360, or
approximately $23.25.

51.    At no time between July 2012 and December 27, 2012, when Lowder
rejected MAA's subsequent offer of 0.3545 (which the Proxy Statement fails to

52.     From the beginning, the Board wanted to pursue an all-stock, non-cash transaction.

53.     This preference for stock-for-stock negatively colored the Board's consideration of other offers, including those of Company B and Company D.

54.     On January 28, 2013, Company D sent an unsolicited written inquiry to Colonial's financial advisor, indicating interest in an all-cash acquisition of Colonial at a premium to the current Colonial stock price. The next day, Company D's Chief Executive Officer contacted Lowder to determine Colonial's interest in a transaction with Company D.  The Proxy Statement simply states that "Colonial did not engage in further substantive discussions with Company D regarding a possible sale transaction at that time."

55.     Company D tried again on March 8, 2013, sending a letter with a private equity investment firm to express interest in an all-cash acquisition of Colonial. On March 12, 2013, the Executive Committee of the Board decided not to pursue discussions based on its "familiarity" with Company D and the private equity investment firm and unsubstantiated fears over Company D's ability to close a transaction.

14

56.     In February 2013, Lowder received unsolicited interest from Company B, who also indicated interest in an all-cash transaction at a premium to Colonial's stock price at that time.  At the March 12, 2013 Executive Committee meeting, the Executive Committee decided to request a proposal in writing that indicated a price, but otherwise would not engage in negotiations.  On March 28, 2013, Company B sent Lowder a letter indicating interest in acquiring Colonial for $26.00 per share in cash, a 15% premium to the then-current Colonial stock price. Company B also agreed to a "go-shop" period for Colonial.

57.     On April 4, 2013, several days before being authorized by the Board to contact MAA, Lowder told a representative from J.P. Morgan, MAA's financial advisor, that "if MAA continued to have an interest in a strategic combination transaction with Colonial, it should indicate that interest."

58.     On April 13, 2013, MAA sent a non-binding proposal for a stock-for-stock transaction with an exchange ratio of 0.360 and a "force the vote" provision.

59.     On April 23, 2013, Company B increased its offer to $26.50 per share as part of an all cash transaction, and again included a "go-shop" provision.  After discussing the difference in fiduciary duties between an all-cash transaction and a stock-for-stock transaction, the Board decided on April 24, 2013 to continue discussions only with MAA.

15

60.    The 0.360 exchange ratio agreed to by MAA and Colonial never offered as much as the offers proposed by Company B or Company C.  In July 2012, Company C indicated interest in a transaction, and had previously offered $23 to $25 per share in cash.  The exchange ratio of 0.360 agreed to by Colonial would have only yielded approximately $23.83 per share based on the volume weighted average price of MAA stock in July 2012.  Company B's offer on April 23, 2013 was $26.50 per share in an all-cash transaction.  The exchange ratio of 0.360 would have yielded approximately $24.50 per share based on MAA's stock price on April 23, 2013 – a full $2 per share *less* than what Company B offered. Based on MAA's stock price on May 31, 2013, the day before the Merger was announced, the exchange ratio would yield approximately $24.22.  Yet the Board pushed aside Company B and Company C in favor of a transaction that would not have forced the Trustees to meet a higher standard and face greater tax liability and ensured their own future at the combined company.

61.    Finally, in approving the Merger, the Board relied, in material part, on BofA Merrill Lynch's opinion concerning the financial fairness of the transaction ("Fairness Opinion").  However, BofA Merrill Lynch's Fairness Opinion is inherently unreliable because BofA Merrill Lynch suffers from known, substantial conflicts of interests, as described below.

### *BofA Merrill Lynch's Material Conflicts Of Interest*

62.    Due to BofA Merrill Lynch's long-standing business relationship with MAA, BofA Merrill Lynch was motivated to endorse the fairness of an otherwise inadequate transaction. By providing its blessing to the Colonial Board, BofA Merrill Lynch was seeking to curry favor with MAA in the hope of both receiving additional business from MAA in the future and not impacting their current business relationship.

63.    As represented in MAA's Form 10-Ks for the past several years, BofA Merrill Lynch or its affiliates have assisted MAA in raising capital through controlled equity offerings, pursuant to which MAA has paid BofA Merrill Lynch considerable money.  For example, MAA entered into a sales agreement with BofA Merrill Lynch, Cantor Fitzgerald & Co. and Raymond James & Associates, Inc. on August 26, 2010 to sell up to 6,000,000 shares of MAA common stock.

64.    The Proxy Statement discloses that BofA Merrill Lynch has received approximately $1.6 million from MAA for "corporate, commercial and investment banking services" but does not disclose specifically what services were performed or what compensation BofA Merrill Lynch has earned from providing *other* services to MAA.

65.    BofA Merrill Lynch's work for MAA represents substantial conflict of interest between BofA Merrill Lynch and the Trust.

66.     Despite this substantial conflict, the Board failed to consider retaining another financial advisor once MAA indicated its interest in acquiring Colonial and allowed BofA Merrill Lynch to serve as Colonial's sole financial advisor for the Merger.

67.     Due to its prior business relationship with MAA, BofA Merrill Lynch had little incentive to create bad blood with MAA by suggesting an auction, a market check, or that the Board select the higher offer from Company B, or by opposing the inadequate terms of the Merger.  To the contrary, BofA Merrill Lynch had every reason to sign off on the Merger in the hopes of securing future MAA business for BofA Merrill Lynch.

68.     As a direct result of these conflicts, MAA was well-positioned to exert undue influence over the sales process by, either directly or indirectly, pressuring BofA Merrill Lynch to endorse the fairness of the inadequate terms of the Merger or unfairly slant the sales process towards MAA.

### *The Board and Management Team's Material Conflicts*

69.     The Board is made up of ten Trustees, of which several have material conflicts.  Lowder is the Chairman and Chief Executive Officer of the Trust, and his brother, James K. Lowder, is a Trustee.  Meisler and Ripps are brothers-in-law and have been Trustees of Colonial since 1995.  Gorrie served as the Chief Executive Officer of Brasfield & Gorrie, L.L.C. from 1964 until 2010 and has been

chairman of its Board of Directors since 1964, a company that the Trust historically has used to manage and oversee certain of its development, redevelopment, and expansion projects. The Trust paid $8.0 million, $4.1 million and $13.7 million for property construction and tenant improvement costs to Brasfield & Gorrie during the years ended December 31, 2012, 2011 and 2010, respectively. In addition, the Trust had $1.6 million, $2.4 million and $1.9 million in outstanding construction invoices or retainage payable to this construction company at December 31, 2012, 2011 and 2010, respectively. Gorrie and Neilsen both served on the board of AmSouth Bank. Lowder, Bailey, and Ripps served on the board of Birmingham Southern College. Mr. Johnson founded and was previously chief executive officer of Johnson Development Company, an Atlanta-based real estate development, leasing, and management company. Colonial and Mr. Johnson's company have a longstanding commercial relationship, with Colonial having purchased numerous properties from Mr. Johnson.

70.     A clear majority of the Board is conflicted, yet approved the Merger as in the best interest of Colonial's shareholders. As part of the Merger, the Board negotiated for five members, including Lowder and his brother, to join the board of directors of the combined company.

71.     Moreover, as specified in a *Frequently Asked Questions* memoranda that the Trust filed with the SEC, several "other members of the executive and

19

senior management team of Colonial Properties Trust will play key senior roles in the new combined company." (The Proxy Statement fails to disclose which members of Colonial management will be in these "key senior roles," whether it includes Lowder, and at what point such key roles were discussed between MAA and Colonial.)

72.     In addition, certain of Colonial's executive officers are subject to a change in control agreements that provides for millions of dollars of benefits in a change-of-control transaction.

### *The Board Agreed to Inadequate Consideration*

73.     The Merger provides a meager premium of approximately 10% based on the closing price of the Trust's stock on May 31, 2013, the last trading day before the Merger was announced. Furthermore, the merger consideration is a fixed exchange ratio of 0.360, which means that the value Colonial shareholders will receive could be significantly less than the approximately $24.22 per share based on MAA's closing price on May 31, 2013, the day before the Merger was announced.

74.     The analyses conducted by BofA Merrill Lynch demonstrate that the Company is undervalued.  For example, the *Selected Precedent Transactions Analysis* yielded an implied value of the Trust as high as $28.00 per share, the *Net Asset Value Analysis* rendered an implied value of the Trust as high as $25.00 per

share and the *Discounted Cash Flow Analysis* yielded an implied value for the Trust as high as $27.25 per share.  BofA Merrilly Lynch's analyses also yielded implied exchange ratios higher than the 0.360 exchange ratio.  For example, the *Selected Public Companies Analysis* rendered an implied exchange ratio as high as 0.374, the *Net Asset Value Analysis* rendered an implied exchange ratio as high as 0.397 and the *Discounted Cash Flow Analysis* rendered an implied exchange ratio as high as 0.422.

75.     Even the analyses performed by MAA's financial advisor, J.P. Morgan, demonstrate that the merger consideration undervalues the Trust. For example, J.P. Morgan's *Public Trading Multiples* analysis yielded an implied value for the Trust as high as $27.00 per share, the *Net Asset Value Analysis* rendered an implied value for the Trust as high as $27.10 per share, and the *Discounted Cash Flow Analysis* yielded an implied value for the Trust as high as $30.00 per share. J.P. Morgan's *Relative Value Analysis* rendered an implied exchange ratio as high as 0.493 based on the discounted cash flow analysis, 0.419 based on the net asset value analysis, and 0.403 based on the public trading multiples analysis.

76.     BofA Merrill Lynch noted that research analysts' stock price targets for Colonial were as high as $26.00 per share.

### ***The Materially Misleading Proxy Statement***

77.     On July 19, 2013, MAA filed the Form S-4 Registration Statement with the SEC. This serves as Colonial's preliminary Proxy Statement for the Merger.

78.     The Proxy Statement sets forth certain information about the Merger but ultimately misrepresents and omits material information which shareholders need to make an informed decision concerning the Merger.

### *Materially Misleading Disclosures Concerning the Process*

79.     The Proxy Statement fails to disclose material information relating to the process leading up to the Merger, including:

(a)     The basis for MAA's request for a closing condition that limited Colonial shareholders' dissenters' rights to a certain percentage on May 23, 2013 and later agreed to be 15% of Colonial shares;

(b)     The dates in which Colonial engaged in discussions with Company A and Company B prior to April 2012 and the basis for ending such discussions;

(c)     The basis for considering Company C's proposed price of $22 to $25 per share as inadequate;

(d)     The basis for selecting BofA Merrill Lynch as financial advisor on April 25, 2012, and whether Colonial or the Board conducted a conflict check or investigation into possible conflicts on the part of BofA Merrill Lynch;

(e)     The basis for the Board to not consider a transaction with Company B or Company C at the April 25, 2012 Board meeting, considering prior discussions or indications of interest from Company B and Company C;

(f)     The extent of communications between Lowder and MAA between July 25, 2012 and August 30, 2012;

(g)     The terms of the standstill provisions in the confidentiality agreement entered into between MAA and Colonial on October 30, 2012, including when such provisions were to expire, the impact of such provisions on Colonial's ability to solicit interest in a transaction after discussions with MAA ended in December 2012, and whether such agreement expired at that time;

(h)     The basis for Lowder requesting terms of a proposal from MAA on November 27, 2012 and whether Lowder was authorized by the Board to request such information;

(i)     The basis for the Board to propose to MAA an exchange ratio of 0.370 on December 16, 2012;

(j)     The valuation approaches utilized by MAA and Colonial, including anticipated growth and expected synergies, ass discussed by the Board at the December 16, 2012 Board meeting;

(k)     The basis for the Board to propose to MAA an exchange ratio of 0.360 on December 21, 2012;

(l)     The basis for the Board failing to contact Company A or Company C after discussions with MAA ended in December 2012;

(m)    The number of unsolicited inquiries received by Colonial and BofA Merrill Lynch between January 2013 and March 2013, including the number of strategic partners and financial partners;

(n)     Who decided not to engage in further substantive discussions with Company D in January 2013;

(o)     The basis for Lowder failing to contact the person who had contacted a member of the Board on April 26, 2013;

(p)     The exact date that the Board decided not to solicit proposals or hold an auction or other sales process;

(q)     The basis for the Transaction Committee not obtaining its own advisors to assist in considering possible strategic transactions;

(r)     The basis for not obtaining a fairness opinion concerning the merger of Colonial Properties LP into MAA LP; and

(s)     The nature and extent, including timing, of any discussions concerning post-transaction employment or other opportunities for any member of the Board or any member of Colonial's management.

*J.P. Morgan's Financial Analysis*

80.     Pursuant to an engagement letter dated May 31, 2013, MAA retained J.P. Morgan as its financial advisor in connection with the Proposed Transaction.

81.     At the meeting of the MAA Board on June 1, 2013, J.P. Morgan rendered its oral opinion, presenting various financial analyses concerning the Proposed Transaction, the full text of which was incorporated in the Proxy Statement.

82.     With respect to J.P. Morgan's *Public Trading Multiples*, the Proxy Statement fails to disclose various material aspects of J.P. Morgan's analysis, including: whether J.P. Morgan performed a benchmarking analysis for Colonial

and/or MAA compared to the selected public comparable companies; and whether the observed multiples for the selected public comparable companies were completely listed or if J.P. Morgan considered any other multiples;

83.     With respect to J.P. Morgan's *Discounted Cash Flow Analysis* ("DCF"), the Proxy Statement fails to disclose various material aspects of J.P. Morgan's analysis, including: J.P. Morgan's definition of unlevered after tax free cash flow used for the purposes of conducting the DCF; J.P. Morgan's inputs and assumptions used to calculate the discount rates range for the Company and MAA; the implied terminal EBITDA multiples ranges for MAA and Colonia; and how J.P. Morgan derived the $51 million assumption of the value of land not developed by 2022.

84.     The Proxy Statement also omits certain material line items from the financial projections prepared by MAA and relied upon by J.P. Morgan for purposes of its analyses for fiscal years 2013-2022, including unlevered free cash flows, revenue, EBITDA, taxes (or tax rate), stock-based compensation (including whether this was treated as a cash or non-cash expense), capital expenditures; and changes in net working capital.

### BofA Merrill Lynch's Financial Analyses and Potential Conflicts of Interests

85.     BofA Merrill Lynch acted as the Board's financial advisor and, in connection therewith, performed various financial analyses concerning "fairness"

of the Merger consideration to be received by the Company's stockholders.

86.     Shareholders are entitled a fair summary of these analyses.  However, the Proxy Statement inadequately discloses the underlying methodologies, key inputs, and multiples relied upon and observed by BofA Merrill Lynch, thereby preventing Colonial's shareholders from taking a serious look at what the Board relied on in approving the Merger.

87.     With respect to BofA Merrill Lynch's *Selected Public Companies Analysis*, the Proxy Statement fails to disclose:

> (a)     The objective criteria utilized by BofA Merrill Lynch in its selection of the comparable companies utilized in this analysis, *e.g.*, geographic limitation, enterprise value, etc.;

> (b)     The multiples for each of the comparable companies in the *Analysis,* including: (i) estimated FFO per share for calendar year 2013 (excluding Colonial but including MAA); (ii) estimated EBITDA for calendar year 2013 (excluding Colonial but including MAA); (iii) estimated FFO per share for calendar year 2013 (including Colonial but excluding MAA); and (iv) estimated EBITDA for calendar year 2013 (including Colonial but excluding MAA); whether BofA Merrill Lynch conducted any benchmarking analysis;

(c)     Whether BofA Merrill Lynch applied multiples to 2013 EBITDA without normalizing for the Merger and other one-time expenses;

(d)     The basis of selecting reference ranges of 15.5x to 17.5x for estimated FFO per share for calendar year 2013 and 17.0x to 18.0x for estimated EBTIDA for calendar year 2013 to apply to Colonial data and the basis for selecting reference ranges of 13.5x to 15.5x for estimated FFO per share for calendar year 2013 and 16.0x to 17.0x for estimated EBTIDA for calendar year 2013 to apply to MAA data; and

(e)     Whether BofA Merrill Lynch also applied selected reference ranges resulting from this analysis to data of Colonial that was not adjusted to reflect the sale of Colonial's Three Ravinia Class A office asset.

88.     With respect to the *Selected Precedent Transactions Analysis*, the Proxy Statement fails to disclose various material aspects of BofA Merrill Lynch's analysis, including:

(a)     The objective criteria utilized by BofA Merrill Lynch in its selection of the precedent companies utilized in this analysis, *e.g.*, geographic limitation, enterprise value, etc., and BofA

28

Merrill Lynch's rationale for selecting only transactions between October 2004 and May 2007 (rather than only more recent transactions);

(b)     The observed multiples for each of the selected precedent transactions, including one-year forward FFO per share, particularly in light of BofA Merrill Lynch's decision to utilize transactions announced over eight years prior to the Merger;

(c)     The basis for not utilizing estimated EBITDA in the analysis; and

(d)     The basis for selecting the range of 17.5x to 21.0x to estimated FFO per share for calendar year 2013.

89.     With respect to the *Discounted Cash Flow Analysis*, the Proxy Statement fails to disclose various material aspects of BofA Merrill Lynch's analysis, including:

(a)     The inputs and key assumptions used by BofA Merrill Lynch to derive the discount rate range of 7.0% to 8.0% for Colonial and 6.5% to 7.5% for MAA;

(b)     BofA Merrill Lynch's  definition of unlevered after-tax free cash flow used for the purposes of conducting the DCF.

     (c)     The basis for selecting the terminal values of 16.0x to 17.0x based on EBITDA multiples for Colonial and 15.5x to 16.5x based on EBITDA multiples for MAA;

     (d)     The ranges of implied perpetuity growth rates derived by BofA Merril Lynch;

90.     With respect to the *Net Asset Value Analysis*, the Proxy Statement fails to disclose the basis for selecting capitalization rates of 5.85% to 6.25% for the Company's operating real estate and 5.95% to 6.35% for MAA's operating real estate.

91.     The Proxy Statement discloses that BofA Merrill Lynch has received approximately $1.6 million from MAA for "corporate, commercial and investment banking services" but fails to disclose exactly what services were performed.

92.     The Proxy Statement fails disclose whether the services rendered to Colonial and MAA (and their respective affiliates) during the two years preceding the rendering of the fairness opinion to Colonial included work performed while BofA Merrill Lynch was retained by Colonial to advise during the process leading to the Merger, and if so the amount of fees paid by either Colonial or MAA for such work.

*Materially Misleading Disclosures Concerning the Financial Projections*

93.    The Proxy Statement fails to disclose projections for Colonial that were prepared by MAA management and provided to J.P. Morgan.

94.    The Proxy Statement also omits certain material line items from the financial projections prepared by Colonial management and relied upon by BofA Merrill Lynch for purposes of its fairness analyses, for fiscal years 2013-2017, including unlevered free cash flows, revenue, EBITDA, taxes (or tax rate), stock-based compensation (including whether this was treated as a cash or non-cash expense), capital expenditures; and changes in net working capital.

95.    The Proxy Statement also fails to disclose 2018 estimated EBTIDA for both Colonial and MAA as utilized by BofA Merrill Lynch in its *Discounted Cash Flow Analysis*.

96.    Because the Proposed Transaction is tainted by self interest and an inadequate process, Plaintiff requires fulsome disclosure of the limited information requested above to determine whether to vote to approve the Proposed Transaction.

97.    Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Trust shareholders will continue to suffer absent judicial intervention.

31

## CLAIMS FOR RELIEF

## COUNT I

**Individually On Behalf of Plaintiff for Violations of Section 14(a)
of the Exchange Act and Rule 14a-9 Promulgated Thereunder
(Against All Defendants)**

98.     Plaintiff repeats all previous allegations as if set forth in full herein.

99.     Defendants have issued the Proxy Statement with the intention of soliciting shareholder support of the Merger.

100.    Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act provides that a proxy statement shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

101.    Specifically, the Proxy Statement violates Section 14(a) and Rule 14a-9 because it is materially misleading in numerous respects and omits material facts, including those set forth above. Moreover, in the exercise of reasonable care, Defendants should have known that the Proxy Statement is materially misleading and omits material facts that are necessary to render them non-misleading.

102.    The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth.

103.    The misrepresentations and omissions in the Registration Statement are material to Plaintiff, and Plaintiff will be deprived of his entitlement to cast a fully informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Merger.

**WHEREFORE**, Plaintiff demands judgment against defendants jointly and severally, as follows:

(A)    enjoining, preliminarily and permanently, the Merger;

(B)    in the event that the transaction is consummated prior to the entry of this Court's final judgment, rescinding it or awarding Plaintiff rescissory damages;

(C)    awarding Plaintiff the costs of this action, including a reasonable allowance for the fees and expenses of Plaintiff's attorneys and experts; and

(D)    granting Plaintiff such further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: August 20, 2013

                      Respectfully submitted,


                      /s/ *Joshua P. Myrick*
                      Joshua P. Myrick
                      Attorney for Plaintiff
                      E-mail: ***josh@stankoskillp.com***
                      Bar I.D.:  asb-6377-s72m

STANKOSKI, L.L.P.
Attorneys and Counselors
8335 Gayfer Road Extension
Post Office Box 529
Fairhope, AL  36533
Telephone:  251/928-0123
Facsimile:   251/929-1000


**OF COUNSEL:**
LEVI & KORSINSKY LLP
Shane T. Rowley
W. Scott Holleman
30 Broad Street, 24th Floor
New York, New York 10004
Tel: (212) 363-7500
Fax: (866) 367-6510
*Pro hac vice applications forthcoming.*